UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL AARON WITKIN,

Plaintiff,

v.

MARIANA LOTERSZTAIN, et al.,

Defendants.

No. 2:15-cv-0638 MCE KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

I.  Introduction

Plaintiff is a state prisoner, proceeding pro se and in forma pauperis.  Defendants' motion for summary judgment, and various related motions and a request, are before the court.  As discussed below, plaintiff's request for *sua sponte* summary judgment in his favor should be denied, and defendants' motion for summary judgment should be granted.

II.  Plaintiff's Verified Complaint

At the time he filed this action in 2015, plaintiff was 38 years old,[1] and claims that he cannot sit or stand "without experiencing extremely severe pain."  (ECF No. 1 at 8-9.)[2]  When housed at Pleasant Valley State Prison ("PVSP"), plaintiff claims his doctor diagnosed plaintiff

---

[1]  Plaintiff was born in 1977, and will soon be 41.

[2]  References to "ECF" refer to the court's electronic docket and page numbers.

1

with a spinal injury resulting in nerve damage and prescribed nerve pain medication oxcarbazepine, and told plaintiff that if his condition did not improve, he would need an MRI to determine why the pain is so severe. (ECF No. 1 at 6.)

Plaintiff states the nerve pain medication provided limited relief, and his mobility was still impaired. On September 7, 2012, plaintiff was transferred to California State Prison, Solano ("CSP-Solano"). Despite presenting with complaints of extreme pain, plaintiff contends that his primary care physician ("PCP") at CSP-Solano, defendant Dr. Lotersztain, refused to prescribe adequate pain relief, to perform an MRI to determine the etiology of plaintiff's pain, or to refer plaintiff to an appropriate specialist. In addition, at various appointments, plaintiff declares that Dr. Lotersztain told plaintiff: "I know you're in severe pain, but the thing is we're just not going to spend any money to do anything about it." (ECF No. 1 at 8, 9.) Or, the pain is "part of being in prison." (ECF No. 1 at 9.) On February 4, 2015, when plaintiff allegedly presented with extremely severe pain, plaintiff claims Dr. Lotersztain acted exasperated, and immediately declared that "I'm not gonna give you an MRI. . . . I know your mobility is impaired and I know you're in a great deal of pain. Look, I don't care, it[']s part of the penalty for your crimes." (ECF No. 1 at 10.)

Plaintiff also alleges that defendants Dr. Pfile[3] and Dr. Kuersten denied plaintiff's administrative appeals seeking pain relief, and failed to obtain medical treatment for plaintiff, despite having knowledge that "extreme departures from the standard of care pervaded [CSP-Solano's] medical services operation." (ECF No. 1 at 8.) In one appeal, plaintiff notes that although staff claims plaintiff is in exceptional physical fitness, they fail to address those times he was "completely immobilized by his back injury and unable to get up off the floor, much less walk." (ECF No. 1 at 20.)[4] Plaintiff claims staff "never diagnosed the problem [or gave] a reasonable explanation for why [plaintiff] has been suffering such severe pain at his fairly young

---

[3] It appears that Dr. Pfile is now known as Dr. Mulligan-Pfile (ECF No. 30-6), but to avoid confusion with the medical records, the undersigned uses the name Dr. Pfile.

[4] Plaintiff's 602 appeals nos. SOL HC 13038309 and SOL HC 14038941 are appended to the complaint. (ECF No 1 at 17-34.)

age." (Id.)

In his Eighth Amendment cause of action, plaintiff claims that Dr. Lotersztain's refusal to treat plaintiff's serious medical need caused the wanton and unnecessary infliction of pain, causing him 18 months of extremely severe pain. (ECF No. 1 at 10.) Plaintiff contends that defendants Lotersztain, Pfile and Kuersten had a duty to order an MRI to rule out or confirm disc herniation and refer plaintiff to a neurologist or orthopedic specialist, but refused to do so. (Id.)

Plaintiff seeks declaratory relief,[5] as well as money damages for the alleged violation of his Eighth Amendment rights, and includes various state law claims against Dr. Lotersztain. (ECF No. 1 at 4-5; 10-12; 7 at 4.)

III. Related Motions

A. Plaintiff's Motion for Disclosure

On May 18, 2017, plaintiff filed a motion for order requiring disclosure of post-deposition communications between defense counsel and the expert, Dr. Barnett. On July 10, 2017, defendants filed an opposition to the motion; however, without waiving their objection, defendants provided plaintiff with a redacted version of all post-deposition communications between defense counsel and Dr. Barnett. Plaintiff did not file a reply.

The provision of the redacted version renders moot plaintiff's motion, which is denied.

B. Plaintiff's Motion for Sanctions

On June 13, 2017, plaintiff filed a motion for sanctions, claiming that Dr. Barnett's amended declaration was submitted in bad faith. Plaintiff seeks exclusion of the declaration, and monetary sanctions. Specifically, plaintiff states that Dr. Barnett submitted his amended declaration after his March 28, 2017 deposition, and now concludes that "[d]efendants['] treatment of Plaintiff's pain complaints was appropriate and consistent with all authoritative standards of care." (ECF No. 76 at 1, citing Barnett Am. Decl. at ¶ 12.) Plaintiff argues that such conclusion is "directly contradicted by his deposition testimony," and is "therefore submitted in bad faith." (Id.) Plaintiff contends that because Dr. Barnett repeatedly testified that the standard

---

[5] Plaintiff's request for preliminary injunctive relief was denied on November 12, 2015. (ECF No. 19.)

1  of care requires that patients suffering neurological symptoms be referred to neurology, that Dr.

2  Barnett's testimony that plaintiff suffered from neurological symptoms, required that plaintiff be

3  referred to neurology contradicts the doctor's conclusion that the medical treatment met the

4  standard of care, rendering the amended declaration a "sham affidavit" which precludes this

5  court's consideration on summary judgment, citing see Yeager v. Bowlin, 693 F.3d 1076, 1080-

6  81 (9th Cir. 2011).  (ECF No. 76 at 3.)  Plaintiff contends that because the amended declaration is

7  a sham affidavit, defendants cannot use the amended declaration to support their motion for

8  summary judgment.  (Id.)

9       In opposition, defendants contend that there is no legal basis to exclude Dr. Barnett's

10  declarations because he is a medical expert who reviewed plaintiff's case and rendered his expert

11  opinion regarding the care provided by defendants.  (ECF No. 77 at 2.)  Plaintiff's disagreement

12  with Dr. Barnett's conclusions is insufficient to exclude Dr. Barnett's declarations because only a

13  medical expert can refute Dr. Barnett's conclusions.  In any event, defendants argue that Dr.

14  Barnett's expert opinion was unchanged by the amended declaration, which only added a couple

15  of footnotes reiterating his deposition testimony for clarification.  (ECF No. 77 at 3.)  Further,

16  defendants contend that despite plaintiff's two cited instances where he complained of

17  neurological symptoms, Dr. Barnett testified that such symptoms only equate to a temporary

18  impairment, not requiring referral to a specialist.  (Id., citing Barnett Dep. at 84-85; 111; 253.)

19  Moreover, defendants argue that Dr. Barnett opined that physical therapy is "the only modality

20  proven to improve chronic low back pain.  Narcotics don't make it better and surgery is not a

21  good solution either."  (Id., citing Barnett Dep. at 253-54.)  Because plaintiff said physical

22  therapy makes it better, Dr. Barnett testified that he "would not order an MRI," or a "CT because

23  we have a diagnosis and we have a treatment.  We have chronic low back pain of the garden

24  variety that responds to physical therapy."  (Id.)

25       The "sham affidavit" rule provides that a "party cannot create an issue of fact by an

26  affidavit contradicting . . . prior deposition testimony."  Yeager v. Bowlin, 693 F.3d 1076, 1080

27  (9th Cir. 2012) (quotation marks and citation omitted).  To apply the rule, the court must "make a

28  factual determination that the contradiction [is] actually a sham" and conclude that the

4

inconsistency is "clear and unambiguous." <u>Van Asdale v. Int'l Game Tech.</u>, 577 F.3d at 989, 998 (9th Cir. 2009). A declaration that "elaborates upon, explains, or clarifies prior testimony" does not trigger exclusion. <u>Id.</u> (citation omitted).

Plaintiff's motion is not well-taken. First, as argued by defendants, the changes made by Dr. Barnett were not substantive. Specifically, both declarations contain paragraph 12 in which Dr. Barnett declares that "defendants' treatment of plaintiff's pain complaints was appropriate and consistent with all authoritative standards of care." (ECF Nos. 30-7 at 16; 63-1 at 16.) The footnotes Dr. Barnett added reiterated his deposition testimony and merely clarified the declaration.

Second, plaintiff argues that his symptoms of numbness and sensation loss in his right leg, and muscle spasms on August 1, 2013 and December 2, 2014 (ECF No. 72 at 53), constitute neurological symptoms requiring referral to a specialist, and because Dr. Barnett testified that the standard of care required a patient suffering neurological symptoms to be referred to a specialist, Dr. Barnett attempts to mislead the court in his amended declaration. However, review of Dr. Barnett's deposition confirms that he distinguished between a "chronic impairment" and a "momentary impairment," identifying the nature of plaintiff's impairment as momentary . (Barnett Dep. at 111.) Dr. Barnett testified that he would be inclined to refer someone to specialty care where the specialty care would be of benefit: "I'm looking at a patient who has a condition that I believe a specialist can help and should help, and that would be someone who is notably impaired with a disease or a condition that will require a specialist's assistance to improve." (Barnett Dep. at 84-85.) Although Dr. Barnett testified that plaintiff had some numbness and loss of sensation in his right leg, he would not order an MRI or surgery because plaintiff was improving with physical therapy, and physical therapy was the proper treatment. (Barnett Dep. 253-54.) Such testimony does not support plaintiff's view that the deposition testimony contradicts Dr. Barnett's declaration.

In addition, Dr. Barnett's review of plaintiff's medical records showed plaintiff "continued to be physically active. He continued to exercise." (Barnett Dep. at 253.) Dr. Barnett confirmed plaintiff's complaints in the record, including frequent complaints that his acute back

pain was at times worse.  (Id. at 255.)  But Dr. Barnett testified that "overall [plaintiff] does not demonstrate -- even when he does say he has lots of pain, he doesn't demonstrate a persistent functional impairment."  (Id. at 255-56.)  The records document that plaintiff "walks with no discomfort, walks with ease, no physical impairment.  He's doing push-ups, which is hard to do if you have significant -- which is impossible really if you have significant low back disease because you have to support your entire torso with your low back when you do pushups."  (Id. at 256.)  In light of Dr. Barnett's deposition testimony, and review of his declarations, the undersigned does not find a contradiction between Dr. Barnett's deposition testimony and his declarations, or that the inconsistency plaintiff alleges is clear and unambiguous.

Finally, and importantly, defendants are correct that plaintiff may only rebut Dr. Barnett's expert medical opinion with the opinion of another medical expert.[6]  Because plaintiff is not a medical doctor, his lay opinions are insufficient.

For all of these reasons, plaintiff's motion for sanctions is denied.

C.  Plaintiff's Motion to Strike Declarations

In his opposition, plaintiff moves to strike both declarations by Dr. Barnett.  (ECF No. 72 at 51.)  Plaintiff argues that Dr. Barnett's declarations are "conclusory and have no evidentiary value."  (Id. at 51.)  However, Dr. Barnett graduated from Harvard Medical School in 1975, is licensed to practice medicine in California, is board-certified in family medicine, and has practiced within the correctional health care field since 2007.  (ECF No. 30-7 at 1-2, 18.)  Dr. Barnett provided an expert medical opinion based on his training and expertise, review of plaintiff's extensive medical records, deposition, and complaint, as well as the discovery responses provided in this action, and the June 1, 2015 screening order.  Dr. Barnett identified the medical records he found pertinent.  Plaintiff provided no legal authority for his claim that only a neurologist could provide an expert opinion in this case.  Moreover, as a lay person, plaintiff cannot refute Dr. Barnett's expert medical opinion.  Plaintiff's motion to strike Dr. Barnett's

_____

[6]  Plaintiff also misquotes the language from the American Academy of Orthopaedic Surgeons.  (ECF No. 76 at 2.)  The language states, "All patients with chronic LBP [lower back pain] should be evaluated not only by a spine specialist but also by their internist, family practitioner, or, for women, their gynecologist."  (ECF No. 72 at 248.)

6

declarations is denied.

Plaintiff also seeks to strike portions of defendants' declarations. However, as medical doctors, each defendant is capable of rendering a medical opinion as to plaintiff's diagnosis and proper treatment. While plaintiff may disagree with their diagnoses, such disagreement provides no basis to strike their declarations. Plaintiff's motion to strike portions of defendants' declarations is also denied.

D. Defendants' Motion to Strike

Defendants' motion to strike plaintiff's Exhibits A, B, C and D, which are health care appeals and responses filed after this lawsuit was filed, is granted. The court has not considered such exhibits because plaintiff's administrative appeals filed after the instant action was filed are not relevant to the instant motion.

E. Plaintiff's Motion to File Sur-reply

On July 18, 2017, plaintiff filed a motion for leave to file a sur-reply to defendants' reply, along with his sur-reply. (ECF Nos. 80, 80-1.) Defendants opposed the motion, arguing there is no valid reason to file a sur-reply. Plaintiff filed a reply.

The Local Rules do not authorize the routine filing of a sur-reply. Nevertheless, a district court may allow a sur-reply "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." Hill v. England, 2005 WL 3031136, at *1 (E.D. Cal. 2005); accord Norwood v. Byers, 2013 WL 3330643, at *3 (E.D. Cal. 2013) (granting the motion to strike the sur-reply because "defendants did not raise new arguments in their reply that necessitated additional argument from plaintiff, plaintiff did not seek leave to file a sur-reply before actually filing it, and the arguments in the sur-reply do not alter the analysis below"), adopted, 2013 WL 5156572 (E.D. Cal. 2013).

Here, defendants did not raise new arguments in the reply brief, and plaintiff's arguments in his sur-reply do not impact the court's analysis. For these reasons, plaintiff's motion to file a sur-reply (ECF No. 80-1) is denied.

////

////

IV.  Defendants' Motion for Summary Judgment

    A.  The Parties' Arguments

        1.  Defendants' Positions

Defendants contend that Dr. Lotersztain's decision to treat plaintiff with non-narcotic medications, not to perform an MRI, not to refer plaintiff to a back specialist, and not to refer plaintiff for surgery was medically acceptable under the circumstances.  Plaintiff's initial back injury occurred about 12 years ago, during an altercation with a police officer.  Plaintiff recovered from the injury, but began having episodes of acute lower back pain.  Defendants argue that plaintiff was seen by Dr. Lotersztain and CSP-Solano medical staff numerous times regarding his complaints of lower back pain, yet received the same diagnosis of chronic lower back pain, most likely caused by degenerative disc disease, by multiple physicians at PVSP, CSP-Solano, and outside medical facilities.  Plaintiff was provided with multiple x-rays and diagnostic tests which confirmed that he presented with no red flags[7] requiring an MRI or consultation with a specialist for surgery.  Defendants contend that plaintiff's primary complaint throughout his visits was that, at almost 40 years old, he is unable to play sports at the same elite level that he claims he was once able to do.  Plaintiff is able to work out vigorously, "advance his game," play sports, walk, run, and perform his regular daily activities with little to no difficulty.  He was observed at every appointment as being in no objectively observable pain, being able to perform all diagnostic tests without being in any objectively observable pain, being able to walk, and sit up and down without difficulty.  Defendants argue that it is not defendants' constitutional duty to return plaintiff to the same level of athleticism he had when he was 20 years old.

In addition, defendants argue that plaintiff's history of drug abuse and the medical records do not indicate that opiates or stronger pain medication was medically necessary.  The medical examinations did not show objective evidence of severe disease or impairment, and was confirmed by diagnostic tests.  Defendants contend that plaintiff's disagreement with his medical treatment does not establish deliberate indifference.

---

[7]  Dr. Barnett appears to define "red flags" as alarming signs of serious disease.  (ECF No. 30-7 at 5:15-16.)

Further, defendants contend that Dr. Lotersztain did not believe that treating plaintiff's pain with non-narcotics and without surgery posed a risk to his health or safety. Dr. Lotersztain saw plaintiff multiple times, performed multiple diagnostic and medically appropriate tests, but found plaintiff did not display any red flags making him a possible candidate for surgery. All of the defendants and Dr. Barnett declare that Dr. Lotersztain's treatment of plaintiff's chronic pain was appropriate and in line with prevailing medical standards. (ECF No. 30-2 at 35.) Moreover, Dr. Barnett testified that the decisions to treat plaintiff with non-narcotics and without surgery did not pose a substantial risk to plaintiff's health. Even assuming Dr. Loterstzain told plaintiff that his pain was "a part of prison life," such claim does not show a lack of medical judgment or disregard of plaintiff's medical needs, and does not create a triable issue of material fact given the medical evidence presented. (ECF No. 30-2 at 36.)

Defendants argue that the denial of plaintiff's grievances by Dr. Kuersten and Dr. Pfile does not state a constitutional violation because he has no constitutional right to a particular grievance procedure. In addition, Dr. Pfile was not required to take additional steps because Dr. Pfile conducted a full review of plaintiff's medical records and complaints and determined Dr. Lotersztain's diagnosis was appropriate, and an MRI, back surgery and opiates were not medically necessary or within the standard of care. Because Dr. Kuersten's role was primarily administrative, ensuring all documents were completed, and the medical opinions of the treating doctor and the second level appeals reviewer aligned and there was no apparent departure from medical standards, defendants argue that Dr. Kuersten was not required to review the medical records or take additional steps.

Defendants argue that Dr. Lotersztain did not commit medical negligence or malpractice because her decision to treat plaintiff according to prevailing medical standards and not provide him with an MRI, referral to a specialist, back surgery, or opiates, was the proper course of treatment in light of diagnostic testing and objective observations that plaintiff presented with no red flags and his condition did not warrant treatment according to his requests. Defendants argue that, contrary to proper treatment plans, plaintiff chose to continue working out vigorously and playing contact sports, re-injuring his back and placing him in discomfort. (ECF No. 30-2 at 38.)

9

Finally, defendants contend they are entitled to qualified immunity.

In support of their motion, defendants provided, *inter alia*, declarations from each defendant, as well as the declaration and amended declaration of their expert witness, Dr. Barnett. (ECF Nos. 30-4, 30-5, 30-6, 30-7, 63-1.)

2. Plaintiff's Opposition

Plaintiff argues that he suffered a devastating spinal injury on December 4, 2012, for which all defendants treated him. (ECF No. 72 at 10.) Specifically, he claims that on December 4, 2012, he suffered a "rupture of a nucleus pulposus (central portion of the invertebral disc) in his lumbar spine, a debilitating spinal injury, which causes the nerve root disorders radiculopathy and sciatica, dramatically reducing mobility and function, and causing excruciating, constant pain. (ECF No. 72 at 7.) Plaintiff claims his symptoms were obvious, even to laypersons, but despite awareness of a possible catastrophic spinal cord injury, each defendant refused to verify that plaintiff's neurological function was intact, and refused to refer him to a specialist, or provide him with adequate pain medication, subjecting plaintiff to almost four years of "extreme, extreme level" pain, and loss of mobility and function. (ECF No. 72 at 7-8, citing Witkin Dep. 55:24-25.) Plaintiff contends that Dr. Kuersten and Dr. Pfile were deliberately indifferent to plaintiff's need for a referral to neurology and an MRI at the time he sustained the spinal injury. Plaintiff objects that Dr. Barnett is not an expert in neurology or "a scientist of the human central nervous system." (ECF No. 72 at 5.)

Plaintiff maintains that defendants failed to provide him with adequate pain medication, resulting in his having to endure "completely unmanaged pain." (ECF No. 72 at 7-8.) Plaintiff argues that a jury could find defendants liable based solely on the four medical encounters on December 12, 2012, January 9, 2013, April 4, 2013, and June 11, 2013. (ECF No. 72 at 55.) Plaintiff contends that despite presenting with overt indications of progressive neurological deficits, defendants purposefully disregarded his symptoms. (ECF No. 72 at 56.)

Plaintiff contends that by June of 2013, defendant Lotersztain suspected plaintiff was suffering from a lumbar disc herniation and purposefully disregarded plaintiff's request for an MRI, and that by 2015, plaintiff was still effectively disabled and off work from January to May

10

due to ongoing and worsening neurological symptoms.

Plaintiff argues that Dr. Lotersztain treated plaintiff "worse than an animal" because although she suspected him of suffering from a herniated disc, knowing it is excruciatingly painful, she "took pleasure in watching plaintiff suffer pain and dramatic mobility loss." (ECF No. 72 at 56.) Plaintiff asked her for narcotic pain medication for over two years at almost every encounter, noting Dr. Lotersztain concedes there were "at least 'thirty-five' encounters." (ECF No. 72 at 56.) Plaintiff argues that defendants' current claim that the denial of narcotic pain medication was based on plaintiff's history of substance abuse is unsupported because there is no evidence that Dr. Lotersztain was even aware of such history or that she took such history into account when she decided not to provide such medication. (ECF No. 72 at 56.) Plaintiff argues that even if the defendants had made a conscious decision to let plaintiff's spinal injury heal on its own over a four year period, such decision should have been made by a neurosurgeon. (Id.)

In support of his opposition, plaintiff provided his own declaration and supplemental declaration, as well as the declarations of his mother, and several inmates. (ECF No. 72 at 63-77; 122-24; 172-86.)

3. Defendants' Reply

Defendants counter that plaintiff's opposition is based on his belief that "multiple nurses, doctors, and physical therapists at [CSP-Solano] and at outside hospitals falsified medical records and medical encounters with plaintiff in order to deny him proper treatment," but offers no evidence to support such accusations. (ECF No. 77 at 1.) Defendants contend that the medical records and diagnosis show plaintiff was provided with excellent medical care, and was not a candidate for opiates or surgery, and that every single medical doctor who evaluated plaintiff's case determined plaintiff suffers from chronic low back pain and degenerative disc disease. (ECF No. 77 at 4.) Plaintiff's desire to be returned to the "first class athlete" status he claims he once enjoyed is not guaranteed under the Eighth Amendment, and his attempt to dispute every medical record over a period of years is not sufficient to raise a genuinely disputed material fact. Plaintiff failed to present any competent expert testimony demonstrating that defendants were professionally negligent or deliberately indifferent, and his unqualified opinions amount to a mere

difference of opinion, which is insufficient to establish deliberate indifference or professional

negligence under California law. (ECF No. 77 at 2.)

B. <u>Summary Judgment Standards</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of

proving the absence of a genuine issue of material fact." <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d

376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving

party may accomplish this by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials" or by showing that such materials "do not establish the absence or presence of a

genuine dispute, or that the adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at

trial, "the moving party need only prove that there is an absence of evidence to support the

nonmoving party's case." <u>Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325.); <u>see</u>

<u>also</u> Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 322. "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for entry of summary

judgment . . . is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist. <u>See</u> <u>Matsushita</u>

<u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the

existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

By contemporaneous notice provided on April 8, 2016 (ECF No. 30-1), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

1    Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  Also, the court earlier provided Rand

2    notice on July 6, 2015.  (ECF No. 13 at 3-4, 6.)

3         C.  Legal Standards

4              1.  Eighth Amendment

5         While the Eighth Amendment of the United States Constitution entitles plaintiff to

6    medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

7    indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

8    Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th

9    Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d

10   1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating

11   that failure to treat [his] condition could result in further significant injury or the unnecessary and

12   wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately

13   indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096); McGuckin v. Smith, 974

14   F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104

15   F.3d 1133 (9th Cir. 1997) (en banc).

16        To establish "deliberate indifference" to such a need, the prisoner must demonstrate:  "(a)

17   a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm

18   caused by the indifference."  Jett, 439 F.3d at 1096.  Deliberate indifference "may appear when

19   prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown

20   by the way in which prison physicians provide medical care."  Id. (citations omitted).  The

21   defendant must have been subjectively aware of a serious risk of harm and must have consciously

22   disregarded that risk.  See Farmer v. Brennan, 511 U.S. 825, 845 (1994).  An "isolated exception"

23   to the defendant's "overall treatment" of the prisoner does not state a deliberate indifference

24   claim.  Jett, 439 F.3d at 1096.  Similarly, "mere malpractice, or even gross negligence" in the

25   provision of medical care does not establish a constitutional violation.  Wood v. Housewright,

26   900 F.2d 1332, 1334 (9th Cir. 1990); see also Farmer, 511 U.S. at 835 (deliberate indifference is

27   "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of

28   due care for the prisoner's interests or safety'") (quoting Whitley v. Albers, 475 U.S. 312, 319

14

1  (1986)); Wilhelm, 680 F.3d at 1123 (a "negligent misdiagnosis" does not state a claim for

2  deliberate indifference).

3      In addition, "[a] difference of opinion between a physician and the prisoner -- or between

4  medical professionals -- concerning what medical care is appropriate does not amount to

5  deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th

6  Cir. 1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th

7  Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was

8  medically unacceptable under the circumstances and that the defendants chose this course in

9  conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson,

10  90 F.3d at 332) (internal quotation marks omitted). Deliberate indifference may be found if

11  defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical

12  treatment." Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

13      In order to prevail on a claim involving defendants' choices between alternative courses of

14  treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the

15  circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health."

16  Jackson, 90 F.3d at 332. In other words, so long as a defendant decides on a medically acceptable

17  course of treatment, his actions will not be considered deliberately indifferent even if an

18  alternative course of treatment was available. Id.

19                      2. State Law Negligence Claim

20      A public employee is liable for injury to a prisoner "proximately caused by his negligent

21  or wrongful act or omission." Cal. Gov't Code § 844.6(d). Under California law, "'[t]he elements

22  of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the

23  protection of others against unreasonable risks (duty); (2) failure to conform to that standard

24  (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting

25  injuries (proximate cause); and (4) actual loss (damages).'" Corales v. Bennett, 567 F.3d 554,

26  572 (9th Cir. 2009) (quoting McGarry v. Sax, 158 Cal. App. 4th 983, 994 (2008)).

27  ////

28  ////

D. Undisputed Facts[8] ("UDF")

Background

1. Plaintiff Michael Aaron Witkin is a state prisoner in the custody of the CDCR.

2. At all times relevant to this action, plaintiff was housed at CSP-Solano.

3. Since June of 2013, defendant Dr. Lotersztain was plaintiff's primary care physician at CSP-Solano. (ECF No. 1 at 5; Lotersztain Decl. at ¶¶ 3, 7.)

4. At all relevant times, defendant Dr. Pfile was a Chief Physician and Surgeon at CSP-Solano, and reviewed plaintiff's health care appeal log numbers SOL HC 14038941 and SOL-HC-13038309 at the second level of review. (Mulligan-Pfile Decl. (hereafter "Pfile Decl.") at ¶1; ECF No. 1 at 32.) From approximately September 7, 2012, to December 13, 2012, Dr. Pfile was plaintiff's primary care physician. (Pfile Decl. at ¶ 4.) Dr. Pfile also saw plaintiff on April 4, 2013, while temporarily covering clinic. (ECF No. 72 at 245.)

5. At all relevant times, defendant Kuersten was a Chief Medical Executive at CSP-Solano, and reviewed Dr. Pfile's decision concerning plaintiff's health care appeal log number SOL HC 14038941 at the second level of review. Dr. Kuersten also treated plaintiff on occasion. See, e.g., ECF No. 30-9 at 12, 19-21; Pl.'s Bates No. 41 (ECF No. 72 at 190); 72 at 224.)

Pain Management

6. Pain treatment is a challenging medical issue, especially in the correctional setting.

7. California's Prison Health Care Services ("CPHCS") has developed pain-management guidelines to provide clinicians with a standardized framework to address pain problems in their patients. The guidelines provide clinical and decision-support information for the management of acute and chronic pain, including the use of opioid medications like methadone. The guidelines are periodically reviewed and revised to reflect current scientific information and outcome data.

8. CDCR clinicians are required to be familiar with the Pain Management Guidelines.

9. Under the guidelines, the primary focus of pain management is to preserve or restore a patient's functional status sufficient to allow the patient to perform the activities of daily living

---

[8] For purposes of summary judgment, the undersigned finds these facts are undisputed, unless otherwise indicated.

16

and participate in facility programming.

10. Pain-management medications are generally classified as non-opioid analgesics, neuropathic pain agents, and opioids.

11. Non-opioid analgesics include non-steroidal anti-inflammatory drugs (NSAIDs), such as Motrin.

12. Neuropathic pain agents target nerve-based pain and include certain anticonvulsant and antidepressant drugs.

13. Opioids (narcotics) are the chronic-pain treatment of last resort. This is because evidence supporting the effectiveness of opioids for long-term treatment of non-cancer chronic pain is limited, and opioids are associated with potentially serious harm, including adverse medical events and abuse potential.

14. Therefore, the use of opioids is appropriate for chronic-pain management only where (1) there is ongoing objective evidence of severe disease; and (2) the disease prevents the patient from performing the activities of daily living.

15. The treating physician must stringently weigh the risks and benefits of opioids, including the patient's co-morbid medical, psychiatric, and substance-abuse histories.

Plaintiff's Medical History

16. Plaintiff played contact sports from junior high through junior college. (Deposition of Michael Witkin (Witkin Dep.) at 17:15-24, 20:5-21:1.)

17. In 2004, plaintiff received a back injury as the result of an encounter with a police officer. (Witkin Dep. at 22:15-23:20; Lotersztain Decl. at ¶ 9.)

18. During the same encounter, plaintiff was shot in his legs and back. (Witkin Dep. at 24:17-24; Lotersztain Decl. at ¶ 9.)

19. Bullet fragments from the incident are still located on plaintiff's right side near his liver. (Witkin Dep. at 27:13-24.)

////

////

////

20.  Plaintiff has a history of substance abuse, including use of cocaine, marijuana, and alcohol.  (Decl. of M. Weeks, Ex. A - Medical Records of Michael Witkin ("WMR") at 273;[9] Barnett Decl. ¶ 8.)

Plaintiff's Medical Records at CSP-Solano

21.  Plaintiff arrived at CSP-Solano on September 7, 2012.

22.  Immediately upon plaintiff's arrival, he was playing contact sports on the yard with the other inmates.  (Witkin Dep. at 45:15-22.)

23.  On October 16, 2012, in his new arrival exam performed by Dr. Pfile, plaintiff was noted as having a history of occasional right shoulder pain treated with Motrin.  He was noted as being an otherwise healthy male.  There was no mention of any back or neck pain.  (WMR at 275; Pfile Decl. at ¶ 5; Lotersztain Decl. at ¶ 11; Barnett Decl. at ¶ 8.)

24.  Plaintiff was on the same pain medication, oxcarbazepine, that he had been prescribed by Dr. Owolabi at PVSP when he arrived at CSP-Solano.  (Witkin Dep. at 49:1-11; Lotersztain Decl. at ¶ 10.)

25.  Plaintiff stopped taking the medication because he did not like the way it was handed out at CSP-Solano.  (Witkin Dep. at 49:9-11.)

26.  On December 5, 2012, plaintiff was taken to the Triage Treatment Area ("TTA"), where he was seen and treated by Dr. Hsieh.  (WMR at 7; Witkin Dep. at 51:2-7; ECF No. 1 at 48-50; Barnett Decl. at ¶ 8.).  Dr. Kuersten also treated plaintiff on December 5, 2012.  (ECF No. 30-9 at 12, 19-21; Pl.'s Bates No. 41 (ECF No. 72 at 190).)  Plaintiff was provided injections of Robaxin, 500 mg., and Toradol, 60 mg, and provided a prescription of Tylenol #3.  (ECF No. 1 at 49.)

27.  Plaintiff was not experiencing any urine or fecal incontinence at this time.  (WMR at 9; Witkin Dep. at 51:8-15.)

28.  On December 6, 2012, plaintiff was seen in the RN line by an unidentified RN.  The RN wrote that plaintiff reported feeling 50% better, but for the past 8 years, at least twice a year,

---

[9]  References to WMR page numbers are to the Bates numbers stamped on the bottom right of the page rather than ECF numbers.

plaintiff had really bad low back pain and muscle spasms where he can't even move and is probably because of the gunshot to his back in 2004. (WMR at 12.) Plaintiff also reported occasional right shoulder/trapezius pain. "Ambulates with steady gate and minimal guarding, denies numbness/tingling to extremities." (WMR at 12.)

Plaintiff now declares[10] that at the December 6, 2012 nurses line, he reported "extreme difficulty walking, and shooting, radiating pain down [his] right leg, with a loss of strength," and reported that his "leg was so numb [he] could barely feel or move [his] foot." (ECF No. 72 at 64.)[11]

29. On December 9, 2012, plaintiff submitted a health care services request form stating he was experiencing extremely severe back pain. (ECF No. 1 at 141.) Plaintiff was x-rayed by Vacaville Imaging on December 10, 2012. The x-ray findings noted plaintiff's "vertebral bodies are well aligned. Mild relative disc space narrowings are present at the L4-5 and L5-S1 levels. No significant endplate osteophytes are present. Lumbar lordosis is normal." (WMR at 16.) The x-ray impressions revealed early lumbar spine degenerative disc disease ("DDD")[12] and multiple bullet fragments in the upper abdomen/lower chest on the lateral view. (WMR at 16; Barnett Decl. at ¶ 8.)

30. On December 12, 2012, Dr. Pfile saw plaintiff and charted that plaintiff was "here following TTA visit 12/5/12 for acute [lower back pain]. [Symptoms] resolved with Toradol,

_____

[10] Defendants filed various evidentiary objections to plaintiff's declaration. Many of defendants' evidentiary objections are well-taken, but in an abundance of caution, and because plaintiff proceeds pro se, the court has included relevant portions of plaintiff's declaration in the statement of undisputed facts.

[11] Plaintiff also cites to the declaration of inmate Smith, paragraph 3; however, Smith does not specifically address plaintiff's symptoms on December 6, 2012, when plaintiff reported to the nurses line, or indicate that Smith witnessed the exchange between plaintiff and the RN. (ECF No. 72 at 122.)

[12] Dr. Barnett explained that DDD "is a term of art used by radiologists and other physicians to describe findings consistent with normal aging of the spine. Orthopedic surgeons disfavor the use of the diagnosis DDD because it implies a 'disease' when often the symptoms are the result of physiologic changes of aging." (Barnett Decl. at 5 n.3, citation omitted.)

Robaxin and heating pad. He is 90% recovered today. No red flags. Has occasional flares." (WMR at 14.) No neurological symptoms were recorded. (Id.) Dr. Pfile recommended plaintiff continue taking Motrin as needed and referred him to physical therapy. (WMR at 14-15; ECF No. 1 at 140; Barnett Decl. at ¶ 8.) In her response to interrogatories, Dr. Pfile confirmed that no diagnostic tests were ordered because following her review of the x-ray and evaluation of plaintiff's complaints and objective symptoms, she determined no further tests were needed in order to diagnose plaintiff with acute low back pain. (ECF No. 72 at 233.) Dr. Pfile declares that during the December 12, 2012 visit, plaintiff reported 90% improvement in his symptoms following the treatment with Toradol, Robaxin, and a heat pad that he was provided in the TTA. (Pfile Decl. at ¶ 6.) "During this visit, he exhibited no red flags or unusual symptoms and his exam was within normal limits." (Id.)

Plaintiff now declares that Dr. Pfile performed a straight leg raising test that registered positive at 50 degrees, when plaintiff cried out and reported pain shooting down the back of his right leg, and which precluded Dr. Pfile from documenting that plaintiff's neurological function was within normal limits. (Pl.'s Decl. at ¶ 7; WMR 14.) Plaintiff declares that he exhibited "extreme difficulty walking, and reported shooting, radiating pain from the right leg with numbness and weakness." (Pl.'s Decl. at ¶ 7.)[13]

However, Dr. Barnett opined that because Dr. Pfile charted plaintiff was 90% recovered, "no red flags," "the likelihood is extremely high that there is no neurological deficit because recovery to a 90% level with no alarming features," such as no fever, no increasing pain, no abnormal neurological signs or symptoms, i.e., plaintiff was not saying "my right leg is weak," "my left leg is weak," "I'm falling down." (Barnett Dep. at 248.) Dr. Barnett confirmed that despite the absence of Pfile's notation that neurological exam was "WNL" (within normal limits), the record as a whole indicates everything was okay. (Id.)

_____

[13] In his statement of disputed facts, plaintiff claims his neurological function was gravely impaired on December 12, 2012. (ECF No. 72 at 127.) Plaintiff's cell-neighbor, inmate Smith, declares that plaintiff was "gravely injured." (ECF No. 72 at 122-23 ¶¶ 3, 4, 7.) However, plaintiff and inmate Smith are not medical doctors and are not qualified to render medical conclusions.

31. Following evaluation of the December 10 x-ray, on December 21, 2012, a chronic care appointment was scheduled for plaintiff by Dr. Hsieh. (Pl.'s Bates No. 450 (ECF No. 72 at 195).)

32. On December 25, 2012, plaintiff submitted a health care services request form stating he was "still experiencing considerable back pain," wanted to go over his x-ray results with his doctor, and "the muscle relaxers work, but only for 30 minutes of pain relief." (WMR at 17.)

33. Plaintiff was seen by the triage nurse, Cary MacDonald, R.N., on December 27, 2012. The RN recorded plaintiff's breathing as even and unlabored; and he was ambulatory, with normal gait. Plaintiff's pain was noted as a 6/10, and he was taking Motrin and Robaxin. (WMR at 17.) Plaintiff was advised to continue taking his medication as directed and to continue back exercises as instructed.

34. On January 9, 2013, plaintiff was seen by Dr. Kuersten, who charted plaintiff's complaints that he still has lower back pain, non-radiating, maintains independent functional ADL status, has not started physical therapy. (WMR at 18.)

35. Dr. Kuersten also charted that plaintiff was sitting comfortably in the waiting area, grinning, getting out of his chair quickly without discomfort or guarding, and ambulated briskly without hesitation/guarding/limp. (WMR at 18.) In the assessment portion, Dr. Kuersten charted lower back strain; x-ray reviewed (mild lumbar DDD); clinician's observations and behavior of plaintiff do not suggest any significant impairment; physical therapy management pending. (WMR at 18.)

36. It is undisputed that Dr. Kuersten terminated the January 9, 2013 appointment. Plaintiff claims Dr. Kuersten "became angry and confrontational" when plaintiff asked what was going to be done about his condition. (Pl.'s Decl. at ¶ 8.) Dr. Kuersten charted that "shortly into the visit," plaintiff "became confrontational and disparaging, and after repeated failed attempts to educate [plaintiff] about facts of his condition and management, the visit was terminated by this provider." (WMR at 18.)

Plaintiff now claims that on January 9, 2013, he reported the following conditions to Dr. Kuersten: Experiencing shooting, debilitating pain, traveling down right buttock and leg; loss of

muscle strength; a burning, pins-and-needles feeling in his shin, ankle, and foot; shin, ankle, and foot felt like "a block of wood;" significant difficulty walking, including a pronounced limp, due to his right leg being "dragged along," and extreme stiffness and soreness originating in his lower lumbar area, proceeding throughout his entire lower back. (Pl.'s Decl. at ¶ 8.) Inmate Smith declares that for at least 5 to 6 months after the December 2012 injury, plaintiff had "an obvious limp." (Smith Decl. at ¶ 7.)

37. On January 9, 2013, Dr. Kuersten requested a psychiatric appointment for plaintiff because his subjective complaints of extreme lower back pain were not supported by objective findings and observation. (WMR at 19.) Dr. Kuersten noted plaintiff appeared to be seeking some sort of a secondary gain, he was acting confrontational and disparaging toward medical providers, and that he may have a possible personality disorder. (WMR at 19; Barnett Decl. at ¶ 8.)

38. In response to Dr. Kuersten's request, Dr. Parroff had a consultation with plaintiff on January 23, 2013, and noted plaintiff can be confrontational. Dr. Parroff further noted plaintiff has a history of being bi-polar. (WMR at 20; Barnett Decl. at ¶ 8.)

39. Plaintiff was seen on February 4, 2013, by RN S. Champen. RN Champen noted plaintiff did not have any complaints of pain or other discomfort and denied any bowel/bladder problems. Plaintiff was instructed to perform back stretches. (WMR at 21.)

40. On February 25, 2013, plaintiff submitted a health care services request form stating he was "experiencing excruciating lower back pain." (WMR at 23.) Plaintiff was seen on February 26, 2013, with complaints of lower back pain, 8/10. Plaintiff informed RN MacDonald that the pain was worsened with activity. Plaintiff was instructed to avoid reinjuring the site and only participate in physical activity as tolerated. (WMR at 24; ECF No. 1 at 137.)

41. On March 12/13, 2013, an unidentified RN saw plaintiff for his complaints of chronic lower back pain 8/10; charted that physical therapy was supposed to help, but plaintiff had not yet seen PT. (WMR at 25.) Plaintiff reported no numbness or tingling. The RN charted that plaintiff was ambulating, bending, sitting and standing without difficulty, and there was no weakness noted by range of motion to affected extremity. (WMR at 25.) The RN confirmed plaintiff's

referral to PT was approved January 7, 2013, but noted CSP-Solano only had one PT, so there was a 3 month waiting period. (WMR at 27.) The RN noted that chronic back pain is something that is permanent -- it may get better and at other times he may experience flare-ups and feel worse -- even receiving back surgery doesn't mean you will be pain free. (WMR at 27.)

42. On March 25, 2013, plaintiff submitted a health care services request form stating he was suffering from extremely severe back pain, 8/10. (WMR at 28, 29.) In a subsequent appointment with RN MacDonald on March 26, 2013, plaintiff expressed that his back pain was made worse by exercise; "Pain is acute, intermittent, throbbing, pain affects sleep, exercise." (WMR at 29.) RN MacDonald also noted plaintiff was sitting comfortably, with no grimacing or restlessness, and that plaintiff's complaints were not consistent with the visual exam. She also noted no neurological deficits. Plaintiff was instructed to avoid reinjuring the site and to use medication as ordered. (WMR at 29.)

43. Plaintiff was seen by DPT A. Stone on April 5, 2013. (WMR at 33.) Plaintiff's pain levels were reported as best: 4/10; worst: 10/10 (6 months), but in general 6-7/10; and currently: 6/10. Plaintiff's pain was constant, throbbing, and he was stiff, but no signs of numbness. Plaintiff's lower back pain was aggravated by working out, prolonged sitting, sleeping pattern, and relieved by medication and stretching. DPT Stone noted plaintiff's x-ray showed DDD. (WMR at 32.)

44. During the physical therapy examination on April 5, 2013, plaintiff stated that "once[he is] warmed up [he] feels better." (WMR at 32.) He also stated he works as a porter. Plaintiff was assessed as having DDD and poor posture. A plan was made to increase mobility and plaintiff was provided a home exercise program ("HEP"). (WMR at 276-77; Barnett Decl. at ¶ 8.)

45. On April 29, 2013, plaintiff submitted a health care services request form stating he was suffering from severe back and foot pain. (WMR at 30; Pl.'s Decl. at ¶ 11 (pain was 8).) On April 30, 2013, plaintiff was seen by RN MacDonald who charted that plaintiff stated his lower back pain was improving, but still has upper back pain with a stiff neck, 6/10, and right foot pain 5/10. Plaintiff was instructed to engage in activity as tolerated. (WMR at 31; Barnett Decl. at

¶ 8.)

Plaintiff now declares he also told RN MacDonald that he had radiating right leg pain and weakness, pain, and numbness in his right foot. (Pl.'s Decl. at ¶ 11.)

46. Plaintiff was seen by physical therapist A. Franklin on May 14, 2013. (WMR at 33.) Franklin described plaintiff's complaints as "morning stiffness. Intermittent chronic lower back pain for 7 years."[14] (Id.) Franklin recorded plaintiff's pain as intermittent, currently 0/10, but when worst, the pain was 7/10. (WMR at 33.) In the assessment, PT Franklin charted that plaintiff showed "very minimal irritability. Patient in absolutely 0 signs of distress" when asked to perform multiple tests and exercises. (WMR at 33; Barnett Decl. at ¶ 8.)

Plaintiff now declares that performing the physical therapy exercises was extremely painful, but he did his best to attempt them. (Pl.'s Decl. at ¶ 12.) In addition, plaintiff now declares that after he obtained his medical records he "noticed Franklin had falsified" the records to show plaintiff was reporting a 0 pain level "when worst" after the first appointment, when plaintiff was actually reporting 7-8 levels." (Pl.'s Decl. at ¶ 12.)

47. Plaintiff was seen by PT Franklin again on May 21, 2013. Plaintiff reported immediate relief from the exercises PT Franklin prescribed (mid back stretching, single leg bridges, and cobra stretch) at their previous appointment. Plaintiff stated he was in no pain, and has his pain under control. (WMR at 34; Barnett Decl. at ¶ 8.)

48. On May 29, 2013, plaintiff was seen by PT Franklin, who charted that plaintiff was "still doing well with his back and staying motivated with his HEP. He is 'advancing his play.'" (WMR at 35.) Plaintiff reported dull ache pain aggravated by prolonged sitting, but reported 0 current pain. Plaintiff was instructed to continue with the prescribed exercises. Franklin noted plaintiff's benefit to physical therapy achieved, and ordered PT discontinued. (WMR at 35; Barnett Decl. at ¶ 8.)

////

---

[14] Defendants read Franklin's note as stating that plaintiff had been playing basketball for the last 3 years, which plaintiff disputes. However, the court reads Franklin's note as stating plaintiff went man down on December 5, after playing basketball for three years, describing plaintiff's history, not his current activities. (WMR at 33.)

Plaintiff denies he told Franklin plaintiff was "advancing his play" because plaintiff had not played sports since his December 2012 injury. (Pl.'s Decl. at ¶ 12.) Plaintiff declares that on May 28, 2013, he was still suffering pain, numbness, and tingling in his right foot and shin, and could not lift the front part of his right foot. (Pl.'s Decl. at ¶ 12.)

Plaintiff's Medical Records & Appeals - Post June 2013 (Dr. Lotersztain)

49. On June 11, 2013, Dr. Lotersztain saw plaintiff for complaints of "having high arch and having foot pain due to state shoe. No trauma, no injury." (Pl.'s Bates 253 (ECF No. 72 at 198).) In the objective portion, the doctor noted plaintiff had pain when pressing below arches; assessed bilateral foot pain, slightly high arch, and ordered insoles. (Id.)

In his declaration, plaintiff now declares he told the doctor of his "excruciating, radiating lower back pain, acute lower back spasms with shooting pain down his right leg with numbness, weakness, tingling, and a pins-and-needles feeling in the right calf and foot; severe stiffness and soreness from the base of his lumbar spine throughout his lower back. (Pl.'s Decl. at ¶ 14.) Plaintiff declares that Dr. Lotersztain told plaintiff he probably had a collapsed or ruptured disc in his lumbar spine, and when asked why plaintiff was having problems with his motor skills and limb numbness, Dr. Lotersztain replied that a "herniated disc [was] probably compressing a nerve root," but "anyway we're not here for that, we're here for your right foot." (Pl.'s Decl. at ¶ 14.) Plaintiff claims he requested an MRI, but was ignored.

50. On July 11, 2013, plaintiff completed a health care services request form stating he was having severe back pain. (WMR at 36, 37.)

51. Plaintiff was seen by RN MacDonald on July 15, 2013, with complaints of severe lower back pain, 8/10. Plaintiff was instructed to follow up with the RN clinic in 72 hours if his symptoms persisted. Plaintiff was also referred to his physician's clinic. (WMR at 37-39.)

52. On August 1, 2013, Dr. Lotersztain saw plaintiff and charted the following: "Subjective: complains of low back pain, discontinued from PT on 5/29, but says he was asymptomatic and did not get full benefit. . . .had a thumb sprain (left) playing basketball. Assessment/Plan: chronic low back pain: no red flags. Consistent with muscle spasms. Continue Ibuprofen. Re-refer to PT (low priority). Educated on realistic expectations."

(WMR at 42, 278; ECF No. 1 at 129; Lotersztain Decl. at ¶¶ 12-13; Barnett Decl. at ¶ 8.)

Plaintiff declares that on August 1, 2013, he also complained of a burning, shooting pain in his right buttock, thigh, and shin with numbness, muscle weakness and muscle spasms in his lower back; severe stiffness and soreness at the base of his lumbar area; and that his pain was 8/10.[15] (Pl.'s Decl. at ¶ 16.) Plaintiff declares he was unable to squat down due to his condition. (Id.) Dr. Lotersztain declares that during the August 2013 visit, despite plaintiff's reports of lower right paraspinal pain, his mobility was completely normal." (Lotersztain Decl. at ¶ 13.)

53. On August 3, 2013, Dr. Lotersztain referred plaintiff to physical therapy. (WMR at 43.)

54. On August 21, 2013, plaintiff was seen by PT Franklin, who noted "physical therapy is not something this patient needs at this time because he already had PT earlier this year and he already performs my rec[ommended] core exercises. He plays sports. He has no signs of distress." (WMR at 43; Lotersztain Decl. at ¶ 14; Barnett Decl. at ¶ 8.)

55. On August 28, 2013, plaintiff filed appeal no. SOL-HC-13038309, claiming that the physical therapist denied plaintiff care "and attempted to downplay the severity of [plaintiff's] chronic back pain that rendered [him] unable to walk as recently as December 5." (ECF No. 1 at 28.) Plaintiff sought physical therapy as prescribed and an MRI. (Id.)

56. On September 19, 2013, plaintiff was seen by RN Ogumleyes for lower back pain, 7/10, identified as dull, throbbing, spasm. (Pl.'s Bates 235.)

57. Plaintiff was seen by Dr. Lotersztain on October 1, 2013, where he presented with complaints of low back pain. Dr. Lotersztain charted the following: "'You know I'm a lawyer and I want an MRI, we are just guessing otherwise.' Seen by PT 8/21/13: patient in no distress, plays sports." (WMR at 284.) Upon examination, plaintiff was noted as "muscular," with "pain in L5-5, radiated to sides. Can squat, walk on toes and fully bend forward." (WMR at 284.) Dr.

---

[15] Plaintiff argues that Dr. Lotersztain falsified this medical record by failing to record plaintiff's back complaints, other than muscle spasms, and declares that Dr. Lotersztain told plaintiff he could expect these symptoms and pain level for the rest of his life. (ECF No. 72 at 129; Pl.'s Decl. at ¶ 16.) Plaintiff contends the doctor failed to refer plaintiff to a spine specialist or provide appropriate pain medication. (ECF No. 72 at 129.) Dr. Lotersztain denies she falsified any medical records of plaintiff. (Lotersztain Decl. at ¶ 46.)

Lotersztain assessed plaintiff's chronic low back pain was "probably from L-spine DDD after years of strenuous exercises. There is no evidence that surgery is helpful, and therefore an MRI is not medically necessary." (WMR at 284.) Plaintiff was advised to limit Motrin due to side effects; changed to Tylenol. Plaintiff was "told to have realistic expectations about chronic pain." (WMR at 284; ECF No. 1 at 127; Lotersztain Decl. at ¶ 15; Barnett Decl. at ¶ 8.)

Plaintiff now disputes that he was able to walk on his toes and heels and squat down because of pain and weakness in his right leg. (Pl.'s Decl. at ¶ 17.) Plaintiff declares that Dr. Lotersztain told plaintiff to expect this type of pain for the rest of his life, and that plaintiff would not be provided with radiological studies or surgery no matter his physical condition. (Pl.'s Decl. at ¶ 17.)

58. On October 9, 2013, nonparty Dr. Hsieh denied plaintiff's first level appeal no. SOL-HC-13038309 in which plaintiff sought an MRI and physical therapy. (ECF No. 1 at 36.) Dr. Hsieh's exam showed plaintiff was very muscular and well developed; there was no obvious kyphosis or scoliosis in plaintiff's lumbar spine; plaintiff could flex and extend with no signs of back pain; plaintiff could flex all the way and touch his toes, squat fully and stand with no back pain, walk on tip toe and heel with no pain; plaintiff's sensation of lower legs was intact, and ankle and patellar reflex were intact. (ECF No. 1 at 36.) Dr. Hsieh noted plaintiff's December 2012 x-ray showed early lower lumbar spine DDD; plaintiff saw the physical therapist on August 21, 2013, who noted plaintiff was in no distress, playing sports. Dr. Hsieh found plaintiff did not meet criteria for MRI. (Id.)

59. On October 22, 2013, plaintiff submitted a health care services request form stating he was suffering "extremely severe lower back pain." (WMR at 44.)

60. Plaintiff was seen on October 24, 2013, with complaints of lower back pain, 9/10, described as throbbing. (WMR at 45.) RN C. Braunger instructed plaintiff to continue recommended lower back exercises and provided plaintiff with an instruction sheet. Plaintiff was also advised to engage in activity as tolerated and to avoid sitting for prolonged periods of time. He was also provided with pain medication Naproxen Sodium 220 mg. (WMR at 45-47; ECF No. 1 at 124-26.)

61. On October 25, 2013, plaintiff was seen by RN M. Smith with complaints of numbness and loss of sensation in his right leg. Plaintiff stated physical therapy makes it better. Plaintiff was referred to his PCP. (WMR at 48-51.)

62. On October 29, 2013, plaintiff was seen by M. Smith, R.N., for complaints of right leg pain, 8/10, described as throbbing, spasm. (WMR at 49.) Plaintiff was referred to his PCP.

63. Plaintiff was seen by Dr. Lotersztain on October 31, 2013, with complaints of chronic low back pain. Plaintiff requested a spine MRI at the appointment. While Dr. Lotersztain was performing diagnostic physical tests on plaintiff, the doctor charted that plaintiff said, "Of course I can bend forward and pick up stuff from the floor, I was a first class athlete!" (WMR at 52; see also Lotersztain Decl. at ¶19.) Dr. Lotersztain documented that plaintiff was seen coming downstairs from class, fast, with no difficulty. (Id.) Dr. Lotersztain assessed plaintiff's chronic lower back pain, and also noted plaintiff complained of "right anterior thigh numbness, but negative physical exam. Prescribed Naproxen, warned about GI side effects." (WMR at 52.) Dr. Lotersztain also noted that she again educated plaintiff on "realistic expectations about chronic pain and/or becoming a 'first class athlete' again." (WMR at 52; ECF No. 1 at 122; Lotersztain Decl. at ¶19; Barnett Decl. at ¶ 8.)

Dr. Lotersztain declares that she observed plaintiff "run down the stairs at a fast pace." (Lotersztain Decl. at ¶19.)

Plaintiff now declares that Dr. Lotersztain refused to examine plaintiff's back, claiming she "already told me the pain was permanent." (Pl.'s Decl. at ¶ 18.)[16]

64. On November 12, 2013, plaintiff submitted a health care services request form stating "severe back pain." (WMR at 53.)

65. RN Braunger saw plaintiff on November 14, 2013, with complaints of lower back pain, 8/10, described as throbbing, spasm. RN Braunger noted plaintiff was able to take his shirt on and off without grimacing. Plaintiff was encouraged to continue recommended exercises and engage in activity as tolerated. (WMR at 54-56; ECF No. 1 at 116-18.)

---

[16] Plaintiff denies he used the phrase "first class athlete," stating he was not enrolled in any class at the time. (ECF No. 72 at 130.) However, plaintiff's denial was not included in his declaration.

66. On November 25, 2013, Dr. Lotersztain saw plaintiff, who complained of low back pain. (WMR at 57.) Plaintiff stated he "did some research" and discovered he cannot have an MRI because of the bullet fragments located in his upper body. The doctor noted plaintiff tried to negotiate: "If you give me a low bunk I won't file a 602 for one year." (Id.) Plaintiff claimed the upper bunk was "inflicting pain to the inmate." (Id.) In her objective exam, Dr. Lotersztain marked plaintiff's musculoskeletal and neurological were within normal limits, and noted plaintiff was able to walk without difficulty. She further noted he was diagnosed with DDD with an x-ray in December 2012. Plaintiff reiterated that he wants to be a "first class athlete" again. Dr. Lotersztain noted that plaintiff's back pain was not disabling and there was no indication for a low bunk, narcotics, or referral to a "back specialist." (WMR at 57; ECF No. 1 at 114; Barnett Decl. at ¶ 8.)

Plaintiff now declares that on November 25, 2013, he told Dr. Lotersztain that the medications were not working, and "outlined the same symptoms," but the doctor "seemed exasperated, and said, 'I know you're in severe pain but thing is we're just not going to spend any money to do anything about it." (Pl.'s Decl. at ¶ 19.) Plaintiff declares the doctor refused to examine his back or refer him to a specialist. (Id.)

67. On December 2, 2013, plaintiff submitted a health care services request form stating he had a seizure the night before and fell out of his bunk, and "was on the floor having severe convulsions." (WMR at 58.) On December 3, 2013, RN Smith noted plaintiff's pain at 0/10; plaintiff denied losing consciousness. (Id.)

68. On December 4, 2013, Dr. Pfile addressed plaintiff's second level appeal in no. SOL-HC-13038309, in which plaintiff requested an MRI and physical therapy. (ECF No. 1 at 32.) Dr. Pfile reviewed plaintiff's appeal and attached documentation, medical history, including progress notes, relevant radiographs, lab results and/or outside consultations. (Id. at 33.) Dr. Pfile determined plaintiff "received a full and appropriate course of physical therapy," completed on May 29, 2013. Plaintiff's medical history revealed that on multiple subsequent exams by more than one provider, plaintiff "showed no objective, clinically significant disability or dysfunction as a result of [plaintiff's] stated back pain." (Id.) Plaintiff's lumbar spine imaging showed only

minimal, early disease, and "no clinical evidence supported an MRI was medically indicated. Dr. Pfile partially granted plaintiff's appeal based on his completion of physical therapy.

69. On December 17, 2013, plaintiff was seen by Dr. Lotersztain for the seizure he suffered two weeks prior. The doctor's objective exam noted plaintiff's musculoskeletal and neurological were within normal limits, and she assessed plaintiff's seizure complaint as "very questionable," suspecting secondary gain based on plaintiff's insistent request for low bunk chrono. (WMR at 62.) Dr. Lotersztain ordered a brain MRI, and noted plaintiff has a history of "demanding narcotics, "back specialist," and low bunk chrono. (Id.)

In his declaration, plaintiff claims Dr. Lotersztain refused to examine plaintiff's back and would not provide stronger medication or refer him to an orthopedic surgeon, despite plaintiff's reported "lower back stiffness, soreness, and pain with muscle spasms, tingling, numbness, and weakness, radiating down his right buttock, thigh and leg." (Pl.'s Decl. at ¶ 20.)

70. Plaintiff was seen by RN W. de la Vega on December 26, 2013, for possible seizure. Plaintiff stated he woke up late at night on December 3, 2013, and felt weak. He stated the next thing he knew he was on the floor. There were no witnesses as plaintiff stated he "didn't want to bother anyone or make a scene." Plaintiff also denied any discomfort at the time. (WMR at 62.)

71. On December 29, 2013, plaintiff submitted a health care services request form complaining of "severe lower back pain with numbness in right leg." (WMR at 64.)[17] RN MacDonald recorded plaintiff's pain at 9/10. (Id.) In his declaration, plaintiff now declares that on December 29, 2013, he was also suffering from muscle spasms, tingling and weakness radiating down his right leg. (Pl.'s Decl. at ¶ 20.)

72. Plaintiff was seen on December 31, 2013, by RN Braunger with complaints of low back pain. The RN noted plaintiff's physical therapy work out and naproxen help with the pain. RN Braunger instructed plaintiff to continue recommended lower back exercises and provided plaintiff with an instruction sheet. Plaintiff was also advised to engage in activity as tolerated and to avoid sitting for prolonged periods of time. (WMR at 65-67; ECF No. 1 at 111-13.)

---

[17] This is the first request form that mentions numbness.

73. On January 25, 2014, plaintiff submitted a health care services request form: "Experiencing severe back pain." (WMR at 71.)

In his declaration, plaintiff now declares that he was also suffering lower back stiffness and soreness, accompanied by muscle spasms, numbness, weakness, loss of sensation, and shooting pain traveling down his right leg. (Pl.'s Decl. at ¶ 21.)

74. On January 27, 2014, triage RN MacDonald noted plaintiff's back pain as 9/10. (WMR at 71.) On January 27, 2014, Dr. Lotersztain ordered x-rays for plaintiff: thoraco -- lumbar spine, lumbosacral spine/comparison. (WMR at 70.)

75. On January 28, 2014, RN Braunger saw plaintiff, who complained of low back pain, 9.5/10, described as throbbing, sharp, spasm. (WMR at 72.) Braunger charted plaintiff had full range of motion, no gait or walking issues. Braunger wrote that plaintiff stated that "if he sits for an extended period of time, sharp shooting pains occur when he first stands up. [Plaintiff] appears restless. . . constantly bouncing legs and rubbing right and left legs. No noted grimacing or spasms." (WMR at 74.) (ECF No. 1 at 107-09; Barnett Decl. at ¶ 8.)[18]

76. Plaintiff's spine was x-rayed on January 30, 2014, per Dr. Lotersztain's order. The results showed no changes from the previous x-ray. The x-ray showed the alignment of plaintiff's spin was within normal limits, the heights of the vertebral bodies and intervertebral disc spaces were normal, there were no fractures, no destructive osseous lesions, and the visualized portions of the sacroiliac joints were unremarkable. (WMR at 75-76; Barnett Decl. at ¶ 8.)

77. On February 16, 2014, plaintiff submitted a health care services request form: "Request to see PCP, suffering very severe back pain." (WMR at 77.) RN MacDonald recorded plaintiff's pain level at 10/10. (Id.)

////

---

[18] Plaintiff disputes this medical record, claiming that on January 28, 2014, he was having issues with his ability to walk due to "severe lower back stiffness, soreness and pain accompanied by muscle spasms, numbness, weakness, loss of sensation, and shooting pain traveling down his right leg." (ECF No. 72 at 131.) However, plaintiff declares that he suffered such issues on January 25, 2014. (Pl.'s Decl. at ¶ 21.) He does not declare that he informed Braunger of such issues.

78. Plaintiff was seen by RN Smith on February 20, 2014, with complaints of low back pain, 10/10, described as sharp, aching, spasm. Plaintiff was prescribed Ibuprofen 200 mg. Plaintiff was provided with materials regarding back pain and was noted as having a high level of education and ability to understand the materials provided to him. (WMR at 78-80; ECF No. 1 at 103-05.)

79. Plaintiff was seen by Dr. Lotersztain on March 10, 2014, in reference to medical appeal log number SOL-HC-14038941, in which plaintiff requested to be referred to a "specialist in the field of back injuries." (WMR at 83) Plaintiff presented with complaints of chronic low back pain. Dr. Lotersztain charted the following:

> Wants "minimally invasive surgery" for back pain. When explained that his disability is not significant, and that there is weak evidence to support his request, he threatened to 'sue you all, and you are the first defendant.'"

> Assessment: "Seen walking without difficulty. Declined physical exam today. No indication for referral to back specialist, for narcotics, and/or low bunk."

(WMR at 82.) In an addendum, Dr. Lotersztain noted that plaintiff stated that he performed his own research and medical treatment is not the norm, "minimally invasive surgery" is. Dr. Lotersztain also noted plaintiff's complaint that he can't exercise like he used to. (WMR at 82-83; ECF No. 1 at 100-01; Barnett Decl. at ¶ 8.)

Plaintiff now disputes this record, declaring that he was unable to walk on his toes and heels or squat down fully due to the stiffness of his back and weakness and numbness in his right leg, and his level 10 pain. (Pl.'s Decl. at ¶ 23.) He declares that Dr. Lotersztain refused to perform a physical exam, and told plaintiff that no matter his condition, no stronger medication or a referral to an orthopedist would be provided. (Id.)

80. Dr. Lotersztain denied appeal log number SOL-HC-14038941 on March 13, 2014. (ECF No. 1 at 24-25.)

81. Plaintiff was seen by Dr. Lotersztain on March 18, 2014. By the chief complaints section, the doctor wrote "as usual." (WMR at 84.) The doctor noted plaintiff was seen 3/10 for

his 602 re back pain, and 12/27 for "new onset seizure. Says he hasn't had one since. Claims seizures since childhood. Plaintiff still complaining of low back pain, stated 'not worse, but not better.'" (Id.) Dr. Lotersztain did not mark any of the boxes in the objective portion of the progress note, but wrote that plaintiff walks without any visible difficulty. Plaintiff's history of seizures assessed as "very questionable," emailed for MRI results and suspected secondary gain based on plaintiff's insistent request for low bunk chrono. (WMR at 84.) Diagnosis was chronic low back pain from mild DDD; plaintiff received PT; treat with NSAIDS, only if pain is severe, and do HEP. Dr. Lotersztain further stated there was no indication for opiates or surgery. (WMR at 84; ECF No. 1 at 99; Barnett Decl. at ¶ 8.)

In his declaration, plaintiff now claims his back pain was not improved, and he reported to Dr. Lotersztain that the medication was ineffective and he was still experiencing right buttock, thigh, and leg weakness and numbness, and muscle spasms. Plaintiff declares that the doctor refused to examine plaintiff's back, and told plaintiff that the state had no intention of providing him with stronger medication or surgery. (Pl.'s Decl. at ¶ 24.)

82. On March 21, 2014, Deputy Director J. Lewis denied plaintiff's appeal no. SOL-HC-13038309 in which plaintiff sought the prescribed physical therapy and an MRI. (ECF No. 1 at 26.)

83. Plaintiff was seen by RN Carlson on March 23, 2014, with complaints of having had a seizure the night before. Plaintiff stated he woke up to use the restroom and fell on the floor, unconscious, and urinated on himself. Plaintiff had no noted distress. (WMR at 85.)

84. Plaintiff was seen on April 4, 2014, by Dr. Lotersztain for new onset seizures. Doctor assessed seizure vs. pseudoseizure; no witnesses; suspected secondary gain as issue arose following denial of lower bunk chrono for musculoskeletal issues. Plaintiff was already on Naproxen and Tylenol. (WMR at 86.)

85. On April 30, 2014, in preparing the second level appeal response in log no. SOL-HC-14038941, Dr. Pfile reviewed plaintiff's appeal, Dr. Lotersztain's interview notes and first level response, plaintiff's medical charts, relevant progress notes, radiographs, lab results, and any outside consultations. (Pfile Decl. at ¶ 10.) Dr. Pfile noted that plaintiff had been examined on

several occasions by multiple providers regarding back complaint; there are no objective exam findings on any exam that support plaintiff's claim of disabling back disease; plaintiff has a very muscular physique and x-rays of the thoracic and lumbar spine are unremarkable, showing only very early lumbar arthritic change, consistent with plaintiff's age and stated history of athletic pursuits; plaintiff completed a full course of physical therapy, and the physical therapist noted that plaintiff was currently participating in sports; there is no objective exam or radiographic evidence of severe arthritic change of the spine, nerve entrapment, muscle spasm or other lumbar pathology; and there is no indication for a subspecialty referral. (ECF No. 1 at 22.) Dr. Pfile denied plaintiff's appeal requesting a referral to orthopedics. (ECF No. 1 at 23.)

86. On May 11, 2014, plaintiff submitted a health care services request form: "Suffering from extraordinarily severe lower back pain." (WMR at 87; Pl.'s Decl. at ¶ 25.) He was seen on May 13, 2014, by RN MacDonald with complaints of low back pain, 10/10. Plaintiff was provided with education consistent with his condition and referred to see his physician. (WMR at 88-90; ECF No. 1 at 96-98.)

87. On June 2, 2014, plaintiff signed a health care services request form: "Experiencing excruciating lower back pain." (WMR at 92.) Plaintiff was seen on June 3, 2014, by RN MacDonald with complaints of low back pain, 10/10, described as throbbing. (WMR at 93.) Plaintiff was observed sitting comfortably with no grimacing or restlessness. Plaintiff stated he would like to return to physical therapy. RN MacDonald charted that plaintiff's complaint was not consistent with the visual exam. (WMR at 93-95; ECF No. 1 at 92-95.)

88. On June 14, 2014, plaintiff submitted a health care services request form: "Excruciating lower back pain." (WMR at 96.) Plaintiff was seen on June 17, 2014, by RN Carlson with complaints of low back pain, 10/10, described as throbbing. RN Carlson noted plaintiff was sitting comfortably without grimacing or restlessness. RN Carlson noted that the visual exam was not consistent with plaintiff's complaints with a 10/10 level of pain. (WMR at 97-99; ECF No. 1 at 87-89.)

89. On July 7, 2014, Deputy Director J. Lewis denied plaintiff's appeal in log no. SOL-HC-14038941, in which plaintiff sought to see a specialist in the field of back injuries. (ECF No.

1  1 at 15-16.)

2       90.  On August 8, 2014, plaintiff submitted a health care services request form:

3  "Excruciating lower back pain."  (WMR at 104.)  On August 12, 2014, RN Carlson saw plaintiff,

4  who complained of right lower back and hip pain, 8-9 out of 10, spasm, numbness and tingling.

5  (WMR at 105.)  Plaintiff was instructed to do activity as tolerated and informed to continue

6  recommended exercises.  (WMR at 105-107; ECF No. 1 at 83-85.)

7       91.  On August 13, 2014, Dr. Lotersztain saw plaintiff for complaints of low back pain.

8  Although the 8/8/12 sick call noted "excruciating back pain," Dr. Lotersztain charted:  "Admits

9  'it is not excruciating today, but it is a 6 or a 7.'  Works as a porter.  Was hoping pain would get

10  better sooner.  Does HEP, some arching positions help."  (WMR at 108.)  In the objective

11  findings, Dr. Lotersztain wrote "no TTP, negative SLR (straight leg raises) because can squat,

12  walk on toes and heels."  (Id.)  Dr. Lotersztain noted the physical exam was benign.  Dr.

13  Lotersztain further noted that during the 602 interview, plaintiff claimed he was a "first class

14  athlete."  (WMR at 108; ECF No. 1 at 81; Barnett Decl. at ¶ 8.)

15       In his declaration, plaintiff disputes the doctor's objective findings, now declaring that he

16  reported excruciating pain shooting down his right leg at 50 degrees," and that he was unable to

17  squat down and walk on his heels and toes "due to right leg weakness and back pain."  (Pl.'s

18  Decl. at ¶ 27.)

19       92.  On September 15, 2014, plaintiff submitted a health care services request form:

20  "Excruciating lower back pain; injuries to right knee and right shoulder."  (WMR at 109.)

21  Plaintiff was seen by RN Smith on September 17, 2017; plaintiff reported pain in lower back,

22  right knee and shoulder, 5/10, aching.  (WMR at 110.)  He was taking acetaminophen and

23  naproxen.  Plaintiff requested to see a different PCP because his current litigation posed a conflict

24  of interest.  (WMR at 112.)

25       93.  On October 14, 2014, plaintiff submitted a health care services request form:

26  "Bulging disc in lower L-spine, excruciating pain and suffering; right knee pain."  (WMR at 114.)

27  Plaintiff was seen on October 17, 2014, by RN Smith with complaints of lower spine pain and

28  right knee pain, 10/10, sharp, spasm.  (WMR at 114.)  Smith noted plaintiff was able to walk with

a normal gait at a normal pace.  Plaintiff requested to have back surgery so he could play football on the yard.  RN Smith noted that plaintiff did not appear to be at a level 10/10 of pain. (WMR at 115-18; Barnett Decl. at ¶ 8.)  Renewed his request for a different PCP due to litigation.  (WMR at 117.)

Plaintiff now declares that on October 14, 2014, he was still experiencing severe lower back pain stiffness, soreness, and pain, muscle spasms with tingling, numbness, and weakness radiating down his right leg.  (Pl.'s Decl. at ¶ 28.)

94.  Plaintiff was scheduled to see Dr. Lotersztain on October 27, 2014, however, he arrived 25 minutes late and was informed he would have to wait until other on-time patients were seen.  Plaintiff refused to wait and left without being examined.  (WMR at 113.)

95.  On November 18, 2014, plaintiff submitted a health care services request form: "Excruciating lower back pain, numbness in legs."  (WMR at 118.)  Plaintiff was seen on November 20, 2014, by RN Smith with complaints of low back pain radiating to his legs, 10/10, aching.  (WMR at 119.)  Plaintiff was noted as having a normal gait and stance, leg raising ok.  Plaintiff was instructed to reduce his work level and continue stretching.  (WMR at 119-121.)

96.  On December 2, 2014, Dr. Lotersztain saw plaintiff for complaints of low back pain, worsening in the last 60 days.  (WMR at 122.)  Plaintiff claimed it was hard to walk and that resting in bed helped some.  Plaintiff was very distressed about pain and not being able to exercise; said he cannot do HEP due to pain.  The doctor noted abnormal musculoskeletal objective findings, noting plaintiff's pain in right lower L6-LS perospinal area; flexion limited due to pain.  Negative straight leg raising "B/L" with limits in right L5-Sl perospinal.  Doctor's assessment was acute onset chronic low back pain, with component of muscle spasm.  Prescribed muscle relaxer, Baclofen, and 10 day lay-in.  Dr. Lotersztain noted plaintiff was very anxious and she suspected anxiety-related pain.  Plaintiff had 2.5 refills of Tylenol and Naproxen; suggested plaintiff try Ibuprofen instead of Naproxen.  Insisted on HEP.  (WMR at 122; Barnett Decl. at ¶ 8.)

97.  On December 17, 2014, plaintiff submitted a health care services request form: "Difficulty walking from numbness throughout right leg."  (WMR at 123.)  Plaintiff was seen on

December 19, 2014, by RN Smith with complaints of low back pain and numbness in his right leg, 9.5/10. RN Smith noted that plaintiff had a steady gait and his stance was normal; full range of motion. (WMR at 124.) Plaintiff was able to reproduce numbness in his right leg when bending his neck down and bending it back in a hunching form. Plaintiff was instructed not to move his neck like that and to continue the recommended exercises. Smith noted that plaintiff was "walking and talking normal, not displaying any types of pain or distress at this time." (WMR at 126.)

98. On January 20, 2015, plaintiff submitted a health care services request form: "Herniated disc in lower back causing excruciating pain." (WMR at 128.) Plaintiff was seen on January 22, 2015, by RN MacDonald with complaints of low back pain, 10/10, throbbing. Plaintiff indicated the pain radiated down his right leg, numbness in his right thigh and sometimes the right foot. RN MacDonald charted that plaintiff continued to be argumentative, stating he will be suing the state for his pain and suffering. RN MacDonald attempted to discuss doctor's observation that pain may be anxiety related, but plaintiff was unable to consider this and was dismissive. Plaintiff encouraged to continue with PT exercises; uncooperative with other suggestions. (WMR at 129-31.)

Plaintiff declares that his mobility was impaired on January 22, 2015, significantly enough that he remained on a lay-in from his job. (Pl.'s Decl. at ¶ 32.) RN MacDonald provided plaintiff with a lay-in for January 22, 2015, to January 30, 2015. (Pl.'s Bates 439.)

99. On February 4, 2015, plaintiff was seen in the dayroom for complaints of low back pain. RN Dingcong and Correctional Officer Greco responded and evaluated plaintiff. Plaintiff was then taken to see RN Ogunleye who noted small non-tender swelling to plaintiff's lower back. Plaintiff indicated he felt tightness in his back in the morning. The tightness progressed throughout the day and in the evening it was hard for him to move. Plaintiff denied any urinary problems, numbness, or tingling, and denied recent injury or trauma. Plaintiff reported the 7/10 lower back pain radiated more to right lower extremity making it difficult to ambulate. RN Ogunleye noted plaintiff had a steady gait to standing. Plaintiff claimed he had slow ambulation but RN Ogunleye observed him able to ambulate, and noted he did not appear in distress.

Plaintiff was provided an ice pack to place on his back, and two injections:  Robaxin and Toradol.  Plaintiff was referred to see his PCP.  (WMR at 132-34)

In his declaration, plaintiff now claims that on February 4, 2015, he was having difficulty ambulating, and had pain and numbness radiating down the right leg into his right foot, and back spasms.  (Pl.'s Decl. at ¶ 33.)

100.  Plaintiff was seen on February 5, 2015, by RN MacDonald.  She noted plaintiff's primary complaint was low back pain, 10/10, throbbing.  Plaintiff stated he felt something move in his lower back and then had sharp pain that made walking difficult, taking 20-30 seconds to stand erect.  He reported the pain radiated down his right leg, with numbness in the right thigh and sometimes his right foot.  RN MacDonald encouraged plaintiff to walk some laps and discussed stretches to loosen the muscles up.  Plaintiff was provided with a lay-in until February 10, 2015, and an appointment with his PCP on February 9, 2015.  (WMR at 135-137; Pl.'s Bates 438.)

101.  Plaintiff was seen by Dr. Lotersztain on February 9, 2015, with complaints of acute onset chronic low back pain.  Dr. Lotersztain noted plaintiff was seen in the TTA on 2/4/15 for low back pain; plaintiff was picking something up and back locked up, he "couldn't move."  (WMR at 138.)  Plaintiff "admits improvement 'after the shots,' but wants a 'stronger medication. . . .'"  (Id.)  In the objective exam, the doctor noted the general and HEENT/Neck were WNL; 0 TTP; "claims not being able to squat."  (Id.)  Dr. Lotersztain assessed plaintiff as having had a back spasm with acute onset chronic pain.  She prescribed he continue ibuprofen and Tylenol, and provided a seven day lay-in.  Dr. Lotersztain noted there were no indication for opiates or specialist referral.  She further noted plaintiff was very argumentative, and she observed him walk out in no distress.  (WMR at 138; Barnett Decl. at ¶ 8.)

In his declaration, plaintiff now claims that on February 9, 2015, he was suffering back spasms and having trouble walking, stiffness and soreness in his lower back, and weakness and numbness in his right leg and foot.  (Pl.'s Decl. at ¶ 34.)  When plaintiff explained his current medications were ineffective, he declares Dr. Lotersztain became exasperated and declared, "I'm not gonna give you an MRI," refused to examine plaintiff or address the ineffective medication.

38

(Id.)  Plaintiff declares he told her it took him 15 minutes to put on his socks, shoes, and pants, and the doctor replied, "I've heard this a million times.  I know your mobility is impaired and I know you're in a great deal of pain.  Look, I don't care, it's part of the penalty for your crimes."  (Id.)  Plaintiff declares the doctor demanded he walk on his heels and toes and squat down, but because of his condition, he was unable to do so.  (Pl.'s Decl. at ¶ 34.)

102.  On February 17, 2015, plaintiff submitted a health care services request form: "Patient has been immobilized by excruciatingly severe lower back pain."  (WMR at 139.)  RN Smith saw plaintiff on February 19, 2015, regarding complaints of lower back pain, 9/10, dull.  RN Smith noted plaintiff had a normal gait and stance and was able to raise his legs.  RN Smith also noted plaintiff had full range of motion, walking without difficulty, and able to sit and rise without pain.  RN Smith also noted plaintiff showed no signs of grimacing or grabbing his back in the appointment.  RN Smith charted that plaintiff

> reports minimal relief with the medication he has, NSAIDS and acetaminophen, he requests further treatment/and or examinations.  [Plaintiff] also reports to be a "first class athlete" and he is not receiving the care he should to be rehabilitated to his previous skill level and also relieved from all pain.  [Plaintiff] encouraged to do back exercises and NSAIDs may not completely relieve all pain in his back, but should relieve some level of inflammation.  Mr. Witkin does not seem to believe in this treatment and he states he will continue to file court paperwork to get further medical treatments.

(WMR at 142.)  Smith provided plaintiff with a lay-in from February 19 to 28, 2015.  (Pl.'s Bates 437.)

103.  On March 9, 2015, plaintiff submitted a health care services request form: "Suffering excruciating, radiating lower back pain, mobility severely impaired."  (WMR at 143.)  On March 11, 2015, plaintiff was seen by RN Smith for pain in back, 10/10, aching.  (WMR at 144.)  RN Smith noted plaintiff had a full range of motion, except plaintiff complained of pain when sitting up in bed.  Plaintiff had normal gait and stance, and was able to raise his legs.  Plaintiff was able to ambulate and bend down without difficulty.  Plaintiff wants to have his back fixed and find out the problem.  He continued to say CSP-Solano medical should do more for his

condition, and said he is going to file a lawsuit. Plaintiff was given handouts on back stretching and strengthening, and a three day lay-in. (WMR at 144-46.)

104. On March 12, 2015, plaintiff submitted a health care services request form: "Excruciating, extremely severe, lower back pain, pain scale of 10+, mobility extraordinarily limited." (WMR at 147.) On March 13, 2015, the triage RN Carlson noted "Ibuprofen - med. effective." (Id.)

105. On March 16, 2015, RN Smith saw plaintiff for his lower back pain, 10/10, aching, throbbing. (WMR at 148.) RN Smith noted no swelling or redness to plaintiff's back; plaintiff had normal gait and stance and was able to raise his legs. RN Smith noted that plaintiff continues to complain of lower back pain, yet he is able to ambulate and get up and down with no noticeable signs of pain or distress. Plaintiff stated he has a high tolerance to pain and does not easily show pain on his face. Plaintiff continued to threaten to sue CDCR medical staff for not giving him back surgery. (WMR at 148-50.) Plaintiff given one week lay-in. (WMR at 147.)

E. Subsequent Medical Records[19]

Subsequently, Dr. Lotersztain saw plaintiff regarding complaints of chronic low back pain on March 27, 2015, and April 24, 2015. (WMR at 154 (ibuprofen changed to Naproxen); 166 (Naproxen changed to Tylenol).) On May 21, 2015, plaintiff presented to Dr. Lotersztain with complaint of "having accidents." (WMR at 179 (labs ordered).) On June 10, 2015, Dr. Lotersztain saw plaintiff for complaints of urine and fecal incontinence. (MWR 185-86 (post-void residual requested).) On June 12, 2015, plaintiff saw Dr. Lotersztain concerning his liver. (MWR 185-86 (Flomax reordered, lab and x-rays ordered).)

June 16, 2015 x-rays of lumbar spine and pelvis reported no bone abnormality, "minimal" pelvic degenerative changes, and "no significant degenerative changes" in his lumbar spine. (Barnett Am. Decl. at 10.) On July 10, 2015, Dr. Lotersztain saw plaintiff for low back pain

---

[19] On March 18, 2015, plaintiff signed the instant complaint, filed on March 20, 2015. (ECF No. 1.) Defendants have summarized subsequent medical records (numbered 79-113). (ECF No. 30-3 at 14-21.) Plaintiff disputes defendants' paragraphs numbered 80, 82-84; 86; 90, 96-102; 106; 112-13.) (ECF No. 72 at 133-36.)

complaints. (WMR at 252.)

On July 27, 2015, plaintiff reported he slipped and fell, and was sent to TTA for evaluation. (WMR 238-42.) Dr. Daszko[20] noted plaintiff "recently completed refresher with physical therapy, says he does his lower back pain exercises twice a day." (WMR at 243.) "States his goal is to return to 'elite-level athletic competition.'" (Id.) Plan: Plaintiff was given Toradol and Robaxin injections; Dr. Daszko noted "some improvement of pain," and discussed with Dr. Djaveherian at NorthBay Medical Center ("NBMC"). (Id.) Dr. Daszko's assessment was "exacerbation of chronic low back pain/DDD/right sciatica, cannot rule out symptoms of Caude Equina Syndrome ("CES").[21]

Plaintiff was transported to NBMC, where he was examined and treated by Dr. Garcia at the emergency department. (WMR at 193-96; 262-66.) Radiology would not authorize an MRI due to bullet fragments in a vital organ. (WMR at 264.) Following Dr. Garcia's discussions with radiology and Dr. Dembner in neurosurgery, it was determined that plaintiff did not have CES, but if further symptoms developed, a myelogram could be performed. (WMR at 264.)

V. Discussion

A. Eighth Amendment Claims

The undersigned finds that defendants have borne their initial responsibility of presenting evidence that demonstrates the absence of a genuine issue of material fact concerning the adequacy of the medical care provided to plaintiff after he injured his back in December of 2012, through Dr. Lotersztain's treatment in early 2015. Defendants have supported their contention that they were not deliberately indifferent to plaintiff's medical needs, and they have provided the expert opinion of Dr. Barnett, who declares that there was no deliberate indifference, based on Dr. Barnett's training and experience, review of plaintiff's extensive medical records, deposition testimony, and complaint, as well as discovery responses. In the absence of any evidence that

[20] Dr. Daszko's name is misspelled throughout the record as "Dr. Dashko," and "Dr. Dasko," but the correct spelling "Daszko" is confirmed at WMR 243.

[21] "Cauda equine syndrome is a condition of acute spinal cord compression in lower back that causes loss of function to muscles of legs, with bowel and bladder incontinence." (Barnett Am. Decl. at 11 n.9.)

defendants were deliberately indifferent to plaintiff's serious medical needs, or that they failed to provide constitutionally adequate medical treatment, defendants have demonstrated entitlement to judgment in their favor on plaintiff's Eighth Amendment claims.

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87 (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48.

### i. Serious Medical Need

The parties do not dispute, and the undersigned finds, that based upon the evidence presented by the parties in connection with the pending motion, a reasonable juror could conclude that plaintiff's chronic lower back pain constitutes an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose.").

### ii. Deliberate Indifference

However, the undersigned finds that plaintiff fails to demonstrate that any of the defendants were deliberately indifferent to his lower back pain. Plaintiff is clearly dissatisfied with the medical treatment he received and is of the opinion that he should have received an MRI, surgery, referral to a specialist, and opiates or stronger pain relievers to alleviate his chronic back

pain. However, without evidence that the failure to provide any or all of the foregoing was medically inappropriate, such failure amounts to no more than a difference of opinion as to what medical care was appropriate. See Cochran v. Rao, 2013 WL 1249192, at *6 (D. Ariz. Mar. 26, 2013) (denying on summary judgment inmate's deliberate-indifference claim because "[i]t was incumbent upon plaintiff to provide an affidavit or deposition of an expert to establish that the care was medically unacceptable"); Conroy v. Avalos, 2010 WL 1268150, at *6 (D. Ariz. Mar. 30, 2010) (same). Such difference of opinion is not evidence of deliberate indifference, as further explained below.

First, the failure to provide an MRI does not demonstrate deliberate indifference. Importantly, Dr. Barnett testified that "the study was not needed as plaintiff was not impaired."[22] (Barnett Decl. at 16.) Further, plaintiff did not submit a medical record or declaration from Dr. Owolabi, his doctor at PVSP, confirming that plaintiff was diagnosed with a spinal injury resulting in nerve damage, and would need an MRI if his condition did not improve (ECF No. 1 at 6).[23] Indeed, the record reflects that the only doctor who recommended an MRI be performed was Dr. Daszko, who requested the MRI to rule out possible CES, not to address back pain. (WMR at 243, 254-56.) Dr. Pfile approved the request the same day. (Id.) However, the radiologist refused to authorize the MRI due to the bullet fragments in plaintiff's vital organ. (WMR at 195.) After ruling out CES, Dr. Garcia discharged plaintiff from the emergency room with the diagnosis of low back pain. (WMB at 196.) Plaintiff submitted no expert medical opinion confirming that plaintiff required an MRI following the December 2012 incident.

Thus, plaintiff's argument that he should have been provided an MRI following the December 2012 incident is unfounded. Notably, it appears unlikely that plaintiff could have an

---

[22] In his deposition, Dr. Barnett explained that "impairment is a significant compromise in the ability to perform the functions of daily life, which are essentially: feeding oneself, dressing oneself, bathing oneself, going to the toilet on one's own ability, and being mobile in the sense of being able to walk unassisted." (Barnett Dep. at 109.)

[23] Dr. Barnett declares that he could not find any notes by Dr. Owolabi recommending MRI studies. (Barnett Am. Decl. at 14, ¶ e.) The sole record identified as Dr. Owolabi's was a progress note describing plaintiff's minor finger injury while he was playing basketball shortly before his transfer to CSP-Solano. (WMR at 274; Barnett Am. Decl. at 14, ¶ e.)

MRI due to the bullet fragments remaining in his body from an earlier gunshot wound.  (WMR at 195; Barnett Am. Decl. at 7 n.4.)

Second, plaintiff was provided a diagnosis:  chronic back pain and DDD.  Indeed, the consistent diagnoses throughout plaintiff's medical records are chronic low back pain and DDD.  Plaintiff appears to disagree with such diagnoses, but provides no expert medical opinion to rebut these diagnoses rendered by his treating physicians and confirmed by Dr. Barnett.

Third, plaintiff's contrary lay diagnosis is insufficient.  Plaintiff provides no expert medical opinion to support his claim that on December 4, 2012, he suffered a "rupture of a nucleus pulposus (central portion of the invertebral disc) in his lumbar spine, a debilitating spinal injury, which causes the nerve root disorders radiculopathy and sciatica, dramatically reducing mobility and function, and causing excruciating, constant pain."  (ECF No. 72 at 7.)  Plaintiff provides no expert medical opinion to support his lay opinion that he was suffering from a debilitating spinal injury, such that he should have been referred to a neurologist or orthopedic specialist or received surgery.  None of the medical records support plaintiff's lay diagnosis, and plaintiff points to no such medical record.  Plaintiff attempts to demonstrate such diagnosis by claiming his symptoms were obvious, even to laypersons (ECF No. 72 at 7-8), but the medical records demonstrate that plaintiff was seen by multiple doctors over the years, including Dr. Garcia, an emergency room doctor outside the prison, and none of them provided such diagnosis.  Rather, the consistent diagnosis was chronic low back pain and DDD.  Plaintiff is not a medical doctor, and he and his inmate witnesses who provided declarations may not diagnose plaintiff's medical condition solely based on their personal observations of his symptoms.

Fourth, there is no evidence plaintiff was diagnosed as suffering a herniated disc.  Plaintiff adduced no competent medical evidence that he sustained a herniated disc in December of 2012.  Plaintiff claims that Dr. Lotersztain told him he suffered a herniated disc, but he points to no medical record including such diagnosis.  In his opposition, he cites to "Bates 253" for his claim that Dr. Lotersztain "initially suspected that plaintiff had a herniated disc" (ECF No. 72 at 55, 56), but such document is a June 11, 2013 progress note documenting treatment for plaintiff's foot pain, and makes no reference to a "herniated disc."  (Pl.'s Bates 253.)

1  Further, in his deposition, plaintiff testified that both Dr. Garcia and Dr. Daszko told

2  plaintiff he had a herniated disc. (Witkin Dep. at 54-55.) Plaintiff declares that Dr. Daszko

3  "opined that the December 4, 2012 injury was likely a L4-L5 or L5-S1 lumbar disc herniation."

4  (Pl.'s Decl. at ¶ 46.) However, Dr. Daszko's July 27, 2015 progress note makes no such

5  diagnosis; rather, Dr. Daszko's final assessment included "exacerbation of chronic lower back

6  pain/DDD," and "could not rule out CES." (WMR at 243.) Plaintiff did not provide a medical

7  record or declaration by Dr. Daszko or Dr. Garcia diagnosing plaintiff with a herniated disc.

8  Indeed, Dr. Garcia's discharge diagnosis for plaintiff was, again, low back pain. (WMB at 196.)

9  Moreover, the record demonstrates that multiple doctors did not believe surgery was

10  necessary for plaintiff's chronic low back pain. (See also Lotersztain Decl. at ¶ 44; Kuersten

11  Decl. at ¶ 12; Pfile Decl. at ¶ 48.) Dr. Barnett testified that the defendants "didn't see a reason to

12  bring [plaintiff] to surgery because [plaintiff was] functioning well enough without it and I

13  agree." (Barnett Dep. at 296.) Dr. Barnett also testified that surgery was not a good solution.

14  (Barnett Dep. at 254.) In his deposition, plaintiff acknowledged that both Dr. Garcia and Dr.

15  Daszko told plaintiff that surgery was not necessary for herniated discs. (Witkin Dep. at 56.)

16  Plaintiff claimed Dr. Daszko was "adamant" that "you don't want to get surgery," . . . [y]ou want

17  to bring this back naturally," based on the low surgical success rate. (Witkin Dep. at 59.)

18  Plaintiff confirmed that both doctors told plaintiff that "if you're not a pro athlete, there would

19  never be a reason why you would need a back surgery." (Witkin Dep. at 61.) Thus, even

20  assuming, *arguendo*, plaintiff sustained a herniated disc in 2012, it appears plaintiff now

21  concedes that surgery was not a viable option.[24] In any event, even if plaintiff's 2012 injury was

22  misdiagnosed, a misdiagnosis does not rise to the level of deliberate indifference. See Wilhelm,

23  680 F.3d 1122-23 (where doctor decided not to operate because he thought prisoner was not

24  suffering from a hernia was a "negligent misdiagnosis," not deliberate indifference).

---

25  [24] Plaintiff provided a declaration from inmate Chavis who reported his own successful surgical

26  outcome following his disc herniation. (ECF No. 72 at 176-77.) But Chavis' successful outcome
fails to demonstrate that surgery was appropriate for plaintiff. Again, the record does not reflect

27  plaintiff was diagnosed with a disc herniation, and there is no medical record or expert medical
opinion stating plaintiff required surgery for his chronic low back pain or DDD. Rather, Dr.

28  Barnett opines that physical therapy was the appropriate treatment.

Fifth, plaintiff strongly believes he should have been referred to a neurologist or other specialist. Indeed, in his opposition, he claims that if this case goes to trial, "the jury will hear testimony from a neurosurgeon about how to properly care for a disorder of the central nervous system." (ECF No. 72 at 6.) But he identified no such expert witness and provided no expert witness report or declaration. And again, he provides no expert medical opinion confirming such referral was required under the circumstances, or finding that the failure to make such referral was medically inappropriate under the circumstances.

Sixth, because the medical records did not reflect that plaintiff sustained a herniated disc or suffered "red flags" or debilitating neurological issues, defendants Dr. Pfile and Dr. Kuersten were not required, under the Eighth Amendment, to take additional steps in the 602 appeals process to seek additional treatment for plaintiff.

Seventh, even taking as true plaintiff's claims about what Dr. Lotersztain told plaintiff about the reasons why plaintiff's demands were not being met, such as it was a penalty for his crime, or to save money, the record reflects that Dr. Lotersztain provided myriad medical treatment for plaintiff, including x-rays, lab tests, prescriptions for Naproxen, ibuprofen, Tylenol, acetaminophen, lay-ins, and an MRI for his brain when he complained of suffering a seizure. Plaintiff was provided physical therapy and multiple lay-ins. This record reflects that plaintiff was seen frequently, and provided medical treatment on numerous occasions. Because Dr. Lotersztain continued to treat plaintiff despite her alleged statements, such alleged statements do not demonstrate deliberate indifference. Plaintiff adduced no expert medical opinion that Dr. Lotersztain chosen course of treatment was medically unacceptable under the circumstances or was taken in conscious disregard of an excessive risk to plaintiff's health.

Finally, with regard to plaintiff's pain complaints, his disagreement with Dr. Lotersztain about the type and strength of his pain medication also does not reflect a conscious disregard of plaintiff's serious medical needs. Rather, based on the record before the court, Dr. Lotersztain's refusal to provide plaintiff with opiates or a stronger pain medication plaintiff preferred did not rise to the level of deliberate indifference in violation of the Eighth Amendment. See McGuckin, 974 F.2d 1050 (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or

46

possible medical need in order for deliberate indifference to be established."); see also Parlin v. Sodhi, 2012 WL 5411710 at *4 (C.D. Cal. Aug. 8, 2012) ("At its core, plaintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication -- Vicodin, Tramadol, etc., -- represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation."); Tran v. Haar, 2012 WL 37506 at *3-4 (C.D. Cal. Jan. 9, 2012) (plaintiff's allegations that defendants refused to prescribe "effective medicine" such as Vicodin and instead prescribed Ibuprofen and Naproxen reflected a difference of opinion between plaintiff and defendants as to the proper medication necessary to relieve plaintiff's pain and failed to state an Eighth Amendment claim).

In his opposition, plaintiff's contends that the medication he was prescribed is "routinely distributed by CDCR physicians for conditions less painful than plaintiff's," and cites various cases where inmates with back pain were provided methadone or morphine. (ECF No. 72 at 56-57.) However, there is no evidence that plaintiff's medical condition was similar to those inmates who were provided methadone or morphine. The undersigned acknowledges that plaintiff's requests for health care escalated from complaints of severe pain to excruciatingly severe pain. But many of the medical professionals, including nonparties, noted that plaintiff's subjective pain complaints did not correspond with his affect or objective exams. Moreover, at times plaintiff was provided stronger pain medications, such as Robaxin, Toradol, and Tylenol #3, as well as muscle relaxers. (ECF No. 1 at 49; WMR 17, 122, 132-34, 238-42.)

Importantly, Dr. Barnett testified that "overall [plaintiff] does not demonstrate -- even when he does say he has lots of pain, he doesn't demonstrate a persistent functional impairment." (Barnett Dep. at 255-56.) Even if plaintiff was not playing basketball or sports, he testified that he "never stopped trying to work out. . . . [he] couldn't work [his] legs. . . . [but he] worked out the whole time. [He] did upper body. . . .[He] did pullups, pushups." (Witkin Dep. at 65-66.) Plaintiff easily performed the HEP physical therapy exercises, testifying, "these exercises are nothing to a person who has been an athlete their whole life." (Witkin Dep. at 64.) Dr. Barnett opined that the defendants' disinclination to provide stronger pain medications was appropriate.

47

(ECF No. 63-1 at 13-14.) Plaintiff provided no expert medical opinion to the contrary, and plaintiff's declaration attempting to dispute myriad medical records after the fact is insufficient to raise a genuinely disputed material fact in light of Dr. Barnett's expert opinion.

Here, the record reflects that plaintiff was prescribed various doses of Naproxen, Ibuprofen, acetaminophen, and Tylenol, and provided physical therapy and a home exercise program to assist plaintiff in addressing his chronic low back pain. Indeed, Dr. Barnett testified that:

> physical therapy has been the only modality proven to improve chronic low back pain. Narcotics don't make it better and surgery is not a good solution either, but physical therapy has the best track record of all the things you can do with chronic low back pain.

(Barnett Dep. at 254.) Plaintiff's pain complaints were not ignored, they were simply not treated in the manner plaintiff wanted. While plaintiff wanted to have opiates or stronger pain medications, such desires fail to rise to the level of deliberate indifference in light of this record. Rather, plaintiff's position amounts to a difference of opinion.

For all of the above reasons, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims.

B. Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) quoting Reichle v. Howards, 566 U.S. 658, 664 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order. Pearson v. Callahan, 555 U.S. 223 (2009).

If a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v.

48

1  Katz, 533 U.S. 194, 201 (2001).

2      Here, the court finds that plaintiff has not established a violation of his Eighth

3  Amendment rights.  Accordingly, there is no need for further inquiry concerning qualified

4  immunity.

5      C.  Plaintiff's State Law Claims

6      Plaintiff's complaint also alleges violations of various California state laws by Dr.

7  Lotersztain.  (ECF No. 1 at 10-11.)  Plaintiff alleges that Dr. Lotersztain committed medical

8  malpractice; failed to summon immediate medical care in violation of California Government

9  Code § 845.6, and intentionally and negligently inflicted emotion al distress by refusing or failing

10  to treat plaintiff's serious medical condition.  (Id.)[25]

11      Subject to the conditions set forth in 28 U.S.C. § 1367(c), district courts may decline to

12  exercise supplemental jurisdiction over state law claims.  Acri v. Varian Assocs., Inc., 114 F.3d

13  999, 1000 (9th Cir. 1997) (en banc).  The court's decision whether to exercise supplemental

14  jurisdiction should be informed by "values of economy, convenience, fairness, and comity."  Id.

15  at 1001 (citations and internal quotation marks omitted).  Further, primary responsibility for

16  developing and applying state law rests with the state courts.  Therefore, when federal claims are

17  eliminated before trial, district courts should usually decline to exercise supplemental jurisdiction.

18  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 & n.7 (1988); Gini v. Las Vegas Metro.

19  Police Dep't, 40 F.3d 1041, 1046 (9th Cir. 1994) ("[I]n the usual case in which federal-law claims

20  are eliminated before trial, the balance of factors . . .will point toward declining to exercise

21  jurisdiction over the remaining state law claims." (emphasis and alteration in original) (quoting

22  Schneider v. TRW, Inc., 938 F.2d 986, 993 (9th Cir. 1991))).

23      The state law claims against Dr. Lotersztain are premised on the same conduct discussed

24  above, which the undersigned finds was constitutionally permissible.  Because the undersigned

25  recommends that defendants' motion for summary judgment be granted on plaintiff's federal

26

27  _____

[25] In his opposition, plaintiff also claims that a jury could find Dr. Pfile and Dr. Kuersten liable
28  for malpractice.  (ECF No. 72 at 51.)  However, in the complaint, plaintiff did not plead state law
claims against such defendants.

49

claims, the undersigned recommends that the district judge decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) as to plaintiff's state law claims.

XI.  Plaintiff's Request for Summary Judgment

In his opposition to defendants' motion, plaintiff requests that the court *sua sponte* grant him summary judgment.  (ECF No. 72 at 6, 8.)  Defendants counter that such request is improper.  (ECF No. 77 at 2.)  In light of the above recommendations, plaintiff's request should be denied.

VI.  Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for order requiring disclosure (ECF No. 68) is denied;

2.  Plaintiff's motion for sanctions (ECF No. 76) is denied;

3.  Plaintiff's motion to strike (ECF No. 52) is denied;

4.  Defendants' motion to strike plaintiff's Exhibits A, B, C and D to his opposition (ECF No. 77-1) is granted;

5.  Plaintiff's Exhibits A, B, C and D to his opposition (ECF No. 72 at 78-120) are stricken; and

6.  Plaintiff's motion to file a sur-reply (ECF No. 80-1) is denied.

Further, IT IS HEREBY RECOMMENDED that:

1.  Defendants' motion for summary judgment (ECF Nos. 30, 63) be granted;

2.  The court decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) as to plaintiff's state law claims; and

3.  Plaintiff's request for *sua sponte* summary judgment in his favor (ECF No. 72) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

50

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 23, 2018

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/witk0638.msj.med